286 So.2d 649 (1973)
STATE of Louisiana, Appellee,
v.
Robert LEICHMAN, Jr., Appellant.
No. 53852.
Supreme Court of Louisiana.
December 3, 1973.
*650 Paul Henry Kidd, Stephen J. Katz, Stanley A. Halpin, Jr., Kidd, Katz & Halpin, Monroe, for appellant.
William J. Guste, Jr., Atty. Gen., LeRoy A. Hartley, Sp. Counsel to Atty. Gen., Ragan D. Madden, Dist. Atty., James T. Spencer, First Asst. Dist. Atty., for appellee.
TATE, Justice.
The defendant Leichman was convicted of murder. La.R.S. 14:30. The verdict of guilty was qualified to provide for life imprisonment without benefit of parole, probation, commutation, or suspension of sentence. La.C.Cr.P. art. 817 (1972). The defendant appeals.
The most serious issues raised by the eighteen bills of exceptions relate to: (1) the trial court's denial of a motion for a change of venue (Bill No. 4); and (2) the trial court's denial of a motion to quash the indictment on the grounds that blacks and women were systematically excluded from the jury venires and the grand jury (Bills Nos. 2 and 3).
1. Change of Venue
The defendant Leichman, a black man, killed two night deputies, one white and one black, who had gone out to his home to quell a disturbance between him and his wife. By the present proceeding, Leichman was tried for and convicted of the murder of one of them, Deputy Neal.
The defendant moved for a change of venue on the ground that he could not obtain a fair and impartial trial by reason of prejudice against him in the minds of the residents of Union Parish, where the crime was committed. La.C.Cr.P. art. 622.[1] As explained by the official revision comment to this article, the intent of the statutory provision for a change of venue is as follows:
"A change of venue ought to be available even though, individually, each juror is not susceptible to a valid challenge for cause, if the defendant can show that overriding all of these things and superimposed upon all of them he still cannot get a fair trial. The change of venue concept should operate where the state of the public mind against the defendant is such that jurors *651 will not completely answer honestly upon their voir dire, or witnesses will be so affected by the public atmosphere that they will not testify freely and frankly."
The defendant bears the burden of proving that he cannot obtain a fair trial in the parish where the prosecution is pending. State v. Richmond, 284 So.2d 317 (La.Sup.Ct., September 24, 1973, Docket No. 53,407) and decisions there cited. As there noted, the Article requires a showing of more than mere knowledge by the public of the facts surrounding the offense. It requires, in addition, proof of such prejudice in the public mind that a fair and impartial trial cannot be obtained in the parish.
We cannot say, on our review of the evidence in support of a change of venue, that the trial court erred in denying the motion.
The motion for a change of venue was heard on June 4, 1973, immediately prior to the trial on the merits which commenced June 6th. Of the six witnesses called by the defendant, five of them testified that the defendant could receive a fair trial in Union Parish; only one, the defendant's daughter, testified to the contrary.
The most impressive reason for assuming public prejudice is based on activities of April 8, 1973, the night of the murder and of the defendant's arrest therefor, two months before the trial. During the nearly three hours of the search for Leichman after the killings, a crowed of 50-100 people had gathered at the parish court house. The crowd consisted of both black and white people. They were talking and milling around, and a few of them were indicating violent intentions toward the defendant. After the defendant was arrested, therefore, he was brought to the parish jail of the adjoining parish, for his safekeeping and to avoid any incident.
However, the evidence indicates that, following that evening, there was no general excitement about the issue. The defendant was returned to the Union Parish jail two weeks or so later and was maintained there until the trial, without further incident.
There was no unusual or sensational publicity about the shootings. The two parish newspapers, with a total press run of about 3,500 in a parish of 18,000 population, carried only three factual stories about the incident prior to the trial of June 6th.[2] No complaint is made that the coverage of the Monroe daily newspapers and television station serving Union Parish was sensational or other that routinely factual following the incident.
We therefore find no merit to the bill taken to the denial of the motion for a change of venue.
2. Composition of the Jury Venires and of the Grand Jury
Two motions to quash the indictment were based upon the contention that women and blacks were systematically excluded from the jury venires and the grand jury.
As to the former, a majority of this court has consistently rejected the contention that due process or equal protection guarantees are offended by the Louisiana provisions that women are exempted from jury service unless they volunteer for it (La.Const. art. 7, Section 41; La.C.Cr.P. art. 402). State v. Davis, 278 So.2d 130 (La.Sup.Ct., October 29, 1973, Docket No. 53,070).
As to the latter contentionthat blacks are systematically excluded from jury service in Union Parish, the chief contention is that, since there is a greater proportion of whites registered to vote than of blacks of the total population, the *652 method of selection from the voter-registration rolls automatically insures a disproportionate diminution of blacks chosen for the venires. There is no evidence, however, that the voter-registration rolls reflects a greater proportion of white than of black adults eligible for jury service; in fact, the median age of the white population is appreciably higher than that of the black. Nor does the evidence reflect the proportions of men and women on the registration rolls.
Further, the evidence disproves any purposeful discrimination.
The evidence shows: Of the 18,447 parish population, 34% is black. Of the 10,863 registered voters, 24% are black. Of the 400 selected for the general venire from which the grand jury was chosen, 16% were black. Of the 400 selected for the general venire from which the petit jury was chosen, 18% were black. Of the grant jury venire of 30, three (or 10%) were black, one of whom was drawn to serve on the grand jury. The petit jury venire of 75 included 11 blacks, or 14.66%. Nowhere in the jury commission records was any attempt made to record the race of the prospective veniremen and jurors.
We doubt that the disproportion between blacks and whites is so great as to constitute a prima facie of purposeful discrimination under Whitus v. State of Georgia, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967), especially since no race was indicated as to the registered voters from whom the veniremen were selected by chance. If, however, such a prima facie case could be assumed to have been established, the evidence convincingly disproves that in fact such purposeful discrimination occurred.
The five jury commissioners, one of whom was black, testified that the jury venires were chosen as follows: Slips of names of all of the registered voters were placed in a box. The slips were then chosen at random from the box. In making up the venire of 400, the commissioners eliminated (1) women (unless they had indicated a willingness to serve, La.C.Cr.P. art. 402), (2) known illiterates, ineligible to serve, (3) those with criminal records, ineligible to serve, (4) those deceased or no longer residents of the parish, and (5) those with birthdates in the 1880's and 1890's, as (on the basis of past experience) too old to agree to serve.[3]
The jury commissioners all testified that no person was eliminated because of race. They testified uniformly that random procedures were used to choose from the registered voters those to serve on the venire, with an attempt to eliminate only those ineligible or unable to serve as jurors. Choosing of the grand jury venire and of the grand and petit juries was also at random and without regard to race. The evidence convincingly establishes color-blind procedures for and selection of veniremen and jurors.
As we recently stated in State v. Jack, 285 So.2d 204, 206 (La.Sup.Ct., October 29, 1973), in rejecting similar contentions under similar circumstances:
"* * * Thus, there exists no showing of purposeful discrimination in the selection of the jury venire. The circumstance that the general venire was selected from the voter registration rolls does not, of itself, constitute a deprivation of constitutional rights. State v. Douglas, 256 La. 186, 235 So.2d 563, cert. denied, 401 U.S. 914, 91 S.Ct. 888, 27 L.Ed.2d 814 (1970); State v. Poland, 255 La. 746, 232 So.2d 499, penalty vacated and remanded, 408 U. S. 936, 92 S.Ct. 2862, 33 L.Ed.2d 754 (1970).
"Moreover, no requirement exists that there be proportionate representation on *653 the jury venire. Rather, the procedures must be reasonably designed to secure a representative sampling of the community. See: Coleman v. Alabama, 389 U.S. 22, 88 S.Ct. 2, 19 L.Ed.2d 22 (1967); Jones v. Georgia, 389 U.S. 24, 88 S.Ct. 4, 19 L.Ed. 2d 25 (1967); Sims v. Georgia, 389 U.S. 404, 88 S.Ct. 523, 19 L.Ed.2d 634 (1967)."
We therefore find no merit to these bills.
3. Other Bills
The only other bills briefed concern (a) the failure of the trial court to sustain the trial court's challenges for cause as to certain jurors and (b) the trial court's failure to declare a mistrial when the prosecuting attorney referred in his opening statement to the killing of the second deputy in the incident and to his questioning a witness about it.
As to (a), Bills Nos. 5, 6, 7, 9, and 10 were taken when the trial court rejected the defendant's challenges for cause to jurors who had initially indicated reservations as to the presumption of innocence, non-understanding of some questions, or friendship with the victim of the murder. In each instance, upon further interrogation, the trial judge was satisfied that the juror would accept the instructions of the court and render an impartial verdict in accordance with the law and the evidence. We find no error in the trial court's rejection of the challenges for cause. La.C.Cr. P. art. 797(2), (3), and (4); State v. Shaffer, 260 La. 605, 257 So.2d 121 (1971).
As to (b), Bill Nos. 14, 15, and 16, the commission of the murder was an immediate concomitant of the offense with which the defendant is charged and, in conjunction with it, formed one continuous transaction; it is thus admissible as constituting part of the res gestae. Under the circumstances, its relevance outweighed its prejudicial effect. La.R.S. 15:447, 15:448; State v. Jefferson, 284 So.2d 882 (La.Sup. Ct., October 29, 1973).
We have also examined the unbriefed bills, Nos. 8, 11, 12, 13, 17, and 18, and we find no merit to them either.

Decree
For the reasons assigned, we affirm the conviction and sentence.
Affirmed.
BARHAM, J., dissents and assigns reasons.
BARHAM, Justice (dissenting).
Under Bill of Exceptions No. 4 defendant raises the issue of the trial court's denial of his motion for change of venue. While there is independent evidence in the record which would warrant the exercise of the sound discretion of the trial judge in ordering the change of venue, Bills of Exceptions Nos. 5, 6, 7, 9 and 10, reserved on voir dire examination, do, under C.Cr.P. Art. 622, lend support to the evidence in chief on the motion for change of venue. Moreover, Bills of Exceptions Nos. 5, 6, 7, 9 and 10, which were reserved when the trial court refused to challenge individual members of the jury venire for cause, present merit in and of themselves, which in my opinion require reversal.
Bill of Exceptions No. 5 was reserved when the court denied defendant's challenge for cause of Joe H. Wingfield. This prospective juror first firmly stated that if the defendant failed to testify he would question in his mind the failure of the defendant to take the stand. On cross-examination, when asked if he would take the law as given to him by the court and not hold it against the defendant if he failed to take the witness stand, the best answer that he could give was, "I'll do my best. I will try." His final answer in summation was that "It's always going to be that subconscious there, why didn't he, but I will do my best to dismiss that part of it." Additionally, when this prospective juror was asked on voir dire of his impression of a *654 plea of insanity as a defense to a crime, he was of the opinion that the defense of insanity would be difficult for him to accept; in fact, it would be much more difficult to arrive at a verdict of "not guilty by reason of insanity" than "not guilty". Moreover, he repeatedly said that he had a very bad opinion of psychiatrists. The district attorney and the judge tried to rehabilitate the prospective juror but the best that can be said for the rehabilitation is that both prejudices he had expressed would remain in the back of his mind during the trial and that he could only try his best to put them aside. This does not constitute a fair and impartial juror under the law. The bill of exceptions was good in my opinion.
When Mr. Ernest Booth was questioned on voir dire as a potential juror, he first stated he was a very close personal friend of the deceased victim. He then stated that he had an opinion about the defendant's guilt or innocence. Of his friendship with the deceased, he said they worked together, they went to the same church, and sat in the same pew at the church. I am of the opinion that the defendant sufficiently established a predisposition on the part of this potential juror to be entitled to challenge him for cause.
Bill of Exceptions No. 7 was reserved during the voir dire examination of Dewitt Crow. Mr. Crow stated that if two deputies were shot while they were trying to arrest someone, he would not believe that the one who shot the deputies could establish any justification for it. He further stated, "Yeah, it would have to be proved to me that he [the defendant] wasn't at fault." The State and the court tried to rehabilitate Mr. Crow but in doing so it became apparent that Mr. Crow was having a difficult time understanding the questions asked by defense counsel, the district attorney and the court. I am of the opinion that defendant had good grounds to challenge this juror for cause.
During the voir dire examination of Floyd N. Nale, this prospective juror stated that the defendant would have to present evidence to show his innocence. Repeatedly, on cross-examination by defense counsel to clear, concise and succinct questions, he responded that the defendant must show something to prove his innocence. The State and the court tried to rehabilitate the potential juror. It is apparent that Mr. Nale was parroting to the State and to the court whatever answer their questions indicated would be acceptable to them. This attempted rehabilitation was ineffective and improper and the challenge for cause of this potential juror should have been allowed.
Bill of Exceptions No. 10 was reserved during the voir dire examination of Alymer Rockett. He first stated, "Well, certainly if the Grand Jury gets an indictment against him charging him with murder, there's always evidence there or they wouldn't have it." To the question of whether or not there was already evidence against the defendant, he replied, "Yes, sir." He further stated that that feeling would always be in his mind. At the same time he stated his opinion that there was evidence already stacked against the defendant and that it would remain in his mind during the deliberations, he also stated he did not think that would make any difference in rendering a decision. Again, like the other jurors, when the State and the court interrogated this potential juror, he tried to give the answers he felt were desired and the court found him to be rehabilitated. However, never did this potential juror, like several of the others previously discussed, tell the court that he could remove from his mind the previously held opinion. He reitered that the opinion would always be there and that the defendant would have to overcome the opinion he carried into the trial and, finally, into the room for deliberations as to guilt or innocence. I am of the opinion the challenge for cause of this juror was good.
A review of these denials of excusing potential jurors for cause merits reversal of the conviction because of the denial of a *655 fair and impartial jury to the defendant. When these bills are considered in combination with the motion for change of venue, it can then be seen that the trial court did not exercise the proper discretion in acting on the motion for change of venue. In addition to the evidence presented on the motion for change of venue, which would of itself warrant the granting of the motion, these five bills of exceptions taken on voir dire show the jurors' difficulty in effectively, openly, and consistently answering on voir dire examination. C.Cr.P. Art. 622 provides, in part:
"In deciding whether to grant a change of venue the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial." (Emphasis supplied.)
The contradictory answers given by the jurors noted in the previous five bills of exceptions are indicative of the difficulty these potentials jurors had in answering on the voir dire examination. Although the State in one or two instances got apparent withdrawal of prior statements which would have given rise to grounds for challenge for cause upon at least three occasions, no unequivocal change of position was drawn from several of the prospective jurors. Not only is there reversible error in the refusal to grant the challenges for cause, but a perusal of the voir dire examination of the potential jurors convinces me that the defendant could not have obtained a fair and impartial trial in the parish where he was convicted. See my dissent in State v. Johnson, 263 La. 462, 268 So.2d 620 (1972).
Finally, I am of the opinion that the discriminatory exclusion of women from jury duty under authority of Louisiana Constitution Article 7, § 41, and Code of Criminal Procedure Article 402 is violative of the United States Constitution.
For the reasons assigned, I respectfully dissent.
NOTES
[1] Article 622 provides:

"A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending.
"In deciding whether to grant a change of venue the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial."
[2] They were: a full factual account on April 12th, the first issue of the weeklies after the shooting; a two-paragraph account of the indictment on April 19th; and a passing one-paragraph reference to a sanity hearing in a story mainly devoted to bootlegging convictions on May 17th.
[3] Any name completely unknown to any of the five commissioners, who included the clerk of court and members drawn from all over the parish, was also eliminated, although only about 25-30 were so eliminated in the choosing of each venire.